Plaintiff's Name **Falao Toalepai**
Prisoner No. **C-80716**
Institutional Address **SQSP, 5-W-75**
**San Quentin, CA 94974**

**FILED**

Jan 10 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Falao Toalepai,
*(Enter your full name)*
v.
K. Allison, et al.

*(Enter the full name(s) of all defendants in this action)*
Additional Defendants pp. 2-4, infra.

Case No. **22-cv-00150-TSH (PR)**
*(Provided by the clerk upon filing)*

**COMPLAINT BY A PRISONER UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983**

## I. Exhaustion of Administrative Remedies.

*You must exhaust available administrative remedies before your claim can go forward. The court will dismiss any unexhausted claims.*

A. Place of present confinement **San Quentin State Prison, One Main St., San Rafael, CA 9497**

B. Is there a grievance procedure in this institution? ☒ YES ☐ NO

C. If so, did you present the facts in your complaint for review through the grievance procedure? ☒ YES ☐ NO

D. If your answer is YES, list the appeal number and the date and result of the appeal at each level of review. If you did not pursue any available level of appeal, explain why.

 1. Informal appeal: **Bypassed**

 2. First formal level: **SQ HC 20001518; Apr. 29, 2021; No Intervention. (Exhibit A)**

3. Second formal level: **SQ HC 20001518; Aug. 4, 2021; No Intervention. (Exhibit A)**

4. Third formal level: **CDCR no longer employs, nor does it have, a Third Level of Review.**

E. Is the last level to which you appealed the highest level of appeal available to you?
YES ☒   NO ☐

F. If you did not present your claim for review through the grievance procedure, explain why.
N/A

## II. Parties.

A. If there are additional plaintiffs besides you, write their name(s) and present address(es).

None besides plaintiff.

B. For each defendant, provide full name, official position and place of employment.
See pp. 2-4, infra.

## III. Statement of Claim.

State briefly the facts of your case. Be sure to describe how each defendant is involved and to include dates, when possible. Do not give any legal arguments or cite any cases or statutes. If you have more than one claim, each claim should be set forth in a separate numbered paragraph.

See pp. 5-14, infra.

## IV. Relief.

Your complaint must include a request for specific relief. State briefly exactly what you want the court to do for you. Do not make legal arguments and do not cite any cases or statutes.
<u>   See pp. 14-16, infra.                                      </u>

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on: <u>**December 26, 2021**</u>     _____
                   *Date*                          *Signature of Plaintiff*

**COMPLAINT BY A PRISONER UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Falao Toalepai,
   Plaintiff,

v.

K. Allison, "and others,"
   Defendants.

Additional Defendants listed at pp. 2-4

Case No. 22-cv-00150-TSH (PR)

Original Complaint-Jury Trial Demanded

**COMPLAINT UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983**

I.                   JURISDICTION & VENUE

A.   This is a civil action authorized by 42 U.S.C. Section 1983 to redress the deprivation, under the color of state law, of rights secured by the Constitution of the United States.

   This Court has jurisdiction under 28 U.S.C. Section 1331 and 1343(a)(3). Plaintiff seeks declaratory relief pursuant to 28 U.S.C. **Section 2201 and 2202.** Plaintiff's claims for injunctive relief are **authorized by 28 U.S.C. Section 2283 & 2284** and Rule 65 of the Federal Rules of Civil Procedure, **As well as Supplemental jurisdiction of state law claims under 28 U.S.C. Section 1367.**

   Plaintiff, has not filed any **previous lawsuits.**

B.   The United States District Court for the Northern District of

1

1  California is an appropriate venue under 28 U.S.C. Section 1391(b)(2)
2  because it is where the events giving rise to the claim occurred.

II.         EXHAUSTION OF ADMINISTRATIVE REMEDY

C.  Plaintiff is currently housed at San Quentin State Prison (SQ) in the city of San Rafael, California 94974.

Plaintiff, lodged a (HC 602) administrative grievance form correlative with the COVID-19 debacle: **(See Exhibit A)**

III.        PLAINTIFF

D    Plaintiff, [Falao Toalepai], is and was at all times mentioned herein a prisoner of the State of California in the custody of the Department of Corrections & Rehabilitation, (CDCR).

IV.         DEFENDANTS

E.  Defendant, Kathleen Allison, is the Director of the Department of Corrections & Rehabilitation.  She is legally responsible for the overall operation of the Department and each institution under its jurisdiction, including: Chino State Prison and San Quentin State Prison.  And at all times held **the rank of Director.**

F.  Defendant, Ralph Diaz, is the secretary of the Department of Corrections & Rehabilitation and responsible for the day-to-day operations of the Department.  And at all times mentioned in this complaint held the rank of Secretary of CDCR.

//

2

1  G.  Defendant, Ron Davis is the Associate Director of Reception Centers (ADRC) of CDCR and in charge of Reception Center Transfers, and responsible for the welfare of those i/m's transferred, i.e., the 121 i/m's transferred from Chino State Prison (CSP) to SQ on May 30, 2020, and at all times mentioned in this complaint held the rank of ADRC. (See Exhibit B, Outcome Data, infra.)

H.  Defendant, Ron Broomfield, is the current Acting (A) Warden at SQ, and is legally responsible for the operation and welfare of all i/m's in that institution, and at all times mentioned in this complaint held the rank of (A) Warden.

I.  Defendant, Clark Kelso, is the Federal Receiver appointed by the Plata/Coleman Court, who is legally responsible for the medical and mental health care of all CDCR prisoners, and at all times mentioned in this complaint held the rank of Federal Receiver for CDCR.

J.  Defendant, Dr. A. Pachynski, is the Chief Medical Officer (CMO) at SQ of CDCR, and is legally responsible for overseeing all medical decisions and policy at SQ.  And at all times mentioned in this complaint held the rank of CMO at SQ.

K.  Defendant, Dr. L. Escobell, is the CMO at CSP of CDCR, and is legally responsible for overseeing all medical decisions and policy at CSP.  And at all times mentioned in this complaint held the rank of CMO at CSP.

//

3

L. Defendant, R. Steven Tharratt, M.D., is/was the Director of CDCR's Medical Services and at all times listed in this complaint, held the rank of Medical Director of CDCR.

M. Defendant, Clarence Cryer, is the SQ Healthcare Chief Executive Director, and at all times mentioned in this complaint, held the title of Chief Medical Director at SQ for CDCR.

N. Defendant, Dean Borders, was Warden at Chino-CIM, (CSP) and legally responsible for the operation and welfare of all i/m's in that prison on May 30, 2020, and at all times mentioned in this complaint held the rank of Warden at CSP.

O. Defendant, Dr. Joseph Bick, is the Director of California Corrections Health Care Services (CCHCS) for CDCR, and at all times mentioned in this complaint-responsible for the health and welfare of all CDCR prisoners, and held the rank of Director CCHCS during the facts alleged in this complaint.

P. Each Defendant is sued individually and in his [or her] official capacity. At all times mentioned in this complaint each Defendant acted under the color of authority of state law.

//

4

V.                BACKGROUND-STATEMENT OF FACTS

Q. On March 4, 2020, pursuant to Gov't Code Section 8625, California Governor Gavin Newsom declared a state of emergency due to the global COVID-19 outbreak. On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.

R. It was axiomatic by early March 2020 the COVID-19 pandemic was ubiquitous. Yet, the California Department of Corrections (CDCR) refused free COVID-19 tests for its staff and inmate (i/m) population. (See Exh. B, infra; also see Plata v Newsom, 4:01-cv-01351 JST (N.D. Cal.); Coleman v. Newsom, 2:90-cv-00520 KJM-DB (E.D. Cal.); In re Staich, 2020 WL6144780 (2020 DJDAR 11353); Brown v. Plata, (2011) 563 U.S. 493,539.) Plaintiff requests judicial notice be taken of these enumerated cases and the Inspector General's Report (IGR) located at Exh. B, infra, and incorporated by reference.

Defendant's have already conceded "actual knowledge" of the "substantial risk of harm" to San Quentin (SQ) i/m's and accept their duty to alleviate their "serious medical needs," Staich, supra, at DJDAR p. 11362. That is undisputed, as to the facts of the case.

S. Plaintiff, asserts Warden Ron Broomfield, Clarence Cryer, Chief Medical Executive Director and Medical CMO at SQ, Dr. Pachyski failed to provide adequate Personal Protective Equipment (PPE) early on in the pandemic. It was not until late April 2020, did SQ-Medical provide masks for its i/m population.

T. In a Joint Case Management Conference Statement filed May 27, 2020, in conjunction with the ongoing litigation in Plata v. New-
//

5

son, the department committed to the court that the transfers would take place around the end of the month. Faced with this self-imposed deadline, the California Corrections Health Care Services (CCHCS) executives (Dr. Bick, Dir. and management at the department's headquarters pressured staff at California Institution for Men (CIM) to do whatever is necessary to execute the transfers of vulnerable high risk i/m's during this time frame. (See Exh. B, Inspector General's Report (IGR) at p. 19, infra.)

U.  CDCR's FMR, C. Kelso (by belief & outcome data) ordered or helped facilitate the transfer of 189 i/m's with pre-existing medical conditions and deemed vulnerable to infection from CIM in Chino to SQ and another prison in Corcoran, both of which were infection free, with the approval of Sec. R. Diaz, Dir. K. Allison and ADRC, R. Davis to SQ which has exceedingly poor ventilation, extraordinary close living quarters, inadequate sanitation due to its antiquated infrastructure and overcrowding, as cautioned in the "<u>Urgent Memo</u>," positing how choosing to house high risk medical i/m's with multiple COVID-19 risk factors at SQ as not a reasonable option. Staich, supra, DJDAR at p. 11356.

V.  Inspector General Roy Wesley told Newsom and legislators the transferees had not been tested to learn whether they were already infected. Actually, CIM-Health Care Executive CMO, Dr. L. Escobell and Dir. of CDCR's Medical Services R. Tharratt explicitly ordered that the i/m's <u>**not be retested**</u> the day before the transfers began, and multiple (prison) executives were aware of the outdated nature

6

of the tests before the transfers occurred, (see Exh. B, Daily Re-corder Newspaper article pp. 1-2; IGR, pp. 19-25, infra), also noting Exec. Dir. CCHCS Dr. J. Bick was responsible for all transfer and testing protocols. Undoubtedly, D. Borders Warden of CIM approved these transfers of untested i/m's. (Id., IGR, pp. 20-21,24.)

W. Medical CMO of CIM Dr. L. Escobell, despite direction from CCHCS Dir. Dr. J. Bick, to conduct COVID-19 testing of the incarcerated persons within 4-6 days of the transfers, the prison only tested one of the i/m's in that time frame, and tested only three of the 189 i/m's within the two-weeks prior to transfers. By belief, Warden Dean Borders was aware as well. (See IGR, at p. 20.)

X. The decision to transfer the medically vulnerable i/m's despite outdated test results was not simply an oversight; instead it was a conscious decision made by prison CIM, CEO Dr. L. Escobell, Warden D. Borders and Dir. of CCHCS Dr. J. Bick and other CCHCS executives. Despite the supervising nurse at CIM's E-Mail alerting CIM Medical Executives and CCHCS Director of Nursing Services, Barbara Barney-Knox that some of the i/m's had not been tested since May 1st. (IGR,20-21.)

Y. The rush by CCHCS Dir. J. Bick, the department's Sec. R. Diaz, and Dir. K. Allison is well as Federal Medical Receiver (FMR) Clark Kelso to transfer 189 medically vulnerable i/m's despite knowing almost all of them had not been tested for COVID-19 for weeks, coupled with staff at CIM screening many of them for COVID-19 symptoms too many hours ahead of the time they were scheduled to board the buses un-

7

necessarily risked the health and lives of thousands of incarcerated i/m's and staff at SQ and Corcoran. (See Exh. B, IGR, p. 22.) Surely, Richard Kirkland, Chief Deputy Receiver, CCHCS and Diana Toche were aware of that these i/m's had not been tested. Yet, rushed CIM personnel to put them on buses As soon as possible. (Ibid.)

Z. As noted in the IGR, at p. 24, viz., One manager integral to the transfer process alerted CIM Warden Dean Borders of the need to discuss challenges in preparing for the transfers with Health Care Staff, advising the Warden, Mr. Borders that CCHCS Dir. Dr. J. Bick and other CCHCS Executives, and FMR, Clark Kelso decided to move the 189 medical vulnerable i/m's from CIM as "soon as possible." Department Headquarters was notified by CIM Medical Personnel via E-Mail May 27, 2020 at 7:14 p.m. that rushing these transfers was problematic. Yet, Sec. Diaz and Dir. Allison countenanced the transfer. (See Exh. B, IGR, E-Mail at p. 24, infra.)

A1. Dr. Escobell, Med. CMO of CIM, despite the short notice re: transfers and not being able to adhere to CCHCS Director's new testing guidelines of May 21, 2020, requiring testing to occur 4-6 days prior to transfer, CIM Medical ordered nurses <u>not to retest</u> i/m's prior to transfer to SQ and Corcoran. (See IGR, and E-Mails at pp. 28-29.) Surely, FMR, Kelso, Sec. Diaz and others are named in the May 28, 2020, 8:34 a.m. E-Mail.

A2. Dir. Dr. J. Bick, in charge of CCHCS dismissed concerns regarding the rushed nature of the transfers, R. Steven Tharratt, Dir. of CDCR's Medical Services also dismissed concerns re: outdated COVID-19

tests and planned to proceed with the transfers anyways. Sec. Diaz and Dir. Allison were well aware of the concerns raised and alarms sounded, but choose to focus on their goal to effectuate the transfers during the last week of May 2020. (See May 28, 2020, 7:56 a.m. E-Mail from Department Headquarters at Exh. B, IGR, at p. 3.)

A3. The department's electronic health record system was falsified, as the Inspector General noted 47 of the entries indicated that screenings were performed after transportation buses left CIM, which was obviously not possible, as posited by the Inspector General. (See IGR, pp. 35-37.)

A4. To further exacerbate the COVID-19 debacle, department Associate Director of Reception Centers (ADRC) Ron Davis, in charge of the transferred i/m's at issue, (by belief, outcome data, and hearing SQ staff talk about it) with the approval of Sec. Diaz, Dir. Allison and CCHCS Dir. Dr. J. Bick decided to disregard the March 2020, and revised April 16, 2020 social distancing guidelines i.e., to maintain 6 feet apart. So, instead of no more than 19 i/m's on a bus, the May 30, 2020 three buses to SQ each held 25, 24 and 23 i/m's for the 10-11 hours during the bus ride increasing the risk of spreading the virus. (See IGR, at p. 39.)

A5. According to the i/m's eletronic health care records and E-Mails from SQ Staff-after the transfer, some of the i/m's were already infected with COVID-19 when they boarded the bus, and others likely became infected during transit. 15 of the 122 incoming i/m's tested

positive for COVID-19. Nine of the 15 i/m's had been on the same bus. (IGR, at p. 39.)

A6. Once the 122 i/m's arrived at SQ on May 30, 2020, SQ Nursing Staff noticed two of the i/m's arrived with symptoms of COVID-19. Despite, that fact Exec. Medical Dir. Cryer, Medical CMO, Dr. Pachynski, and R. Broomfield, Warden had these i/m's placed in cells with open doors, allowing air to flow in-and-out spreading the virus.(See IGR, at p. 41 et seq.)

A7. Further, exacerbated by Marin County Public Health Officer (MPHO) Dr. Matthew Willis, learing of the May 30, 2020 transfers of untested i/m's to SQ. He immediately held a conference call with inter alia, Warden, R. Broomfield of SQ, Med. Exec. Dir. C Cryer and Med. CMO Dr. A. Pachynski, promulgating how all transferred i/m's must be sequestered from the native SQ population, masks worn, restricted movement of exposed staff etc... Instead, defendant's chose not to implement those basic safety measures, and informed MPHO, Dr. Willis that local health officers like him lack authority to mandate measures to State run prisons. On July 3, 2020 SQ opted to enlist Dr. Willis, as a member of the Incident Command Response Team. (See Staich, supra, DJDAR at p. 11356.)

A8. By the time SQ-Exec. Med. Dir. C. Cryer, Med. CMO, Dr. Pachynski and Warden, R. Broomfield thought about ordering the transferees tested for COVID-19, "many of those who tested positive had been housed in the unit for at least six-days. The virus then spread quickly through the housing units and to multiple areas of the pri-

10

son. The prison's inability to properly quarantine and isolate i/m's exposed to or infected with COVID-19, conflated with the practice of allowing staff to work throughout the prison during shifts or on different days, likely caused the virus to spread to multiple areas of the prison." (Id., at Exh. B, IGR, pp. 41-55, infra.)

A9. On July 7, 2020, Judge Tigar, stated, CDCR's only option for minimizing the harm of the virus to the incarcerated population would be to dramatically reduce the population at San Quentin. (See Plata v. Newsom, No. cv-01001351-JST (U.S. Dist. Ct. N.D. Cal.).

A10. Ultilmately, plaintiff incurred numerous COVID-19 symptoms e.g., difficulty breathing, forgetful, dizzyness, body aches, weakness, headaches, nausea, no smell or taste, diarrhea and vomitting were some of the effects of exposure to the COVID-19 virus. (See Med. File, at Exh. C, infra.)

A11 On July 2, 2020, in the Plata case management conference, it expressed its view that defendant's must urgently release a significant number of elderly or otherwise medically vulnerable i/m's to avoid the unnecessary spread of and deaths from COVID-19 among both i/m's and staff alike. (Plata v. Coleman, 4:01-cv-01251-JST (N.D. Cal.)

A12. Plaintiff, continues to experience adverse effects from the COVID-19 virus, due to numerous other etiological ailments e.g., Obese, that is over 40 BMI, Hypertension and high blood pressure all exacerbated by exposure to COVID-19. (See Med. File at Exh. C, infra.)

A13.  On October 20, 2020, the First District Court held that CDCR acted with deliberate indifference to the risk of substantial harm to elderly and medically vulnerable prisoners incarcerated in San Quentin State Prison by failing to follow their own experts, they brought in, i.e., Clark Kelso-the Receiver asked Dr. Brie Williams, director of the University of California San Francisco (UCSF) and Dr. Stefano Bertozzi, dean emeritus of the University of California Berkeley School of Public Health, and colleagues selected by them to visit SQ and provide guidance on how CDCR could contain the sky-rocketing transmission of COVID-19 at SQ.

The UCSF experts provided the recieiver and defendant's a document entitled <u>Urgent Memo</u>" which assigned central importance to the prompt reduction of the population of SQ by at least 50% of current capacity. (Williams & Bertozzi, Urgent Memo, COVID-19 Outbreak: San Quentin Prison (June 15, 2020). The Urgent Memo, expressed particular concern with WestBlock, where plaintiff is housed.(See <u>In re Ivan Von Staich</u>, 2020 DJDAR 11353,11355-58 [WL6144780].)

A14.  Not sure of the date, but CDCR Officials planned to transfer 50 i/m's to North Kern State Prison (NKSP), and C/O S. Beaton was working Receiving & Release (R&R). Just after one Saturday morning he was working WestBlock where plaintiff is housed, plaintiff overheard him telling the C/O's at the WestBlock desk how Ron Davis called him at 12:30, re: sending the 50 i/m's to NKSP. S. Beaton, told R. Davis, that a few tested positive for COVID-19. Yet, Ron Davis said, "send them anyways." S. Beaton, replied, "I don't want to be on that lawsuit," ultimately refusing to send them.

12

A15. As articulated by Dr. Chris Beyrer, professor of epidemiology, International Health, and Medicine at Johns Hopkins Bloomberg School of Public Health, states, "it is self-evident from the 75% infection rate and rates of morbidity and mortality at SQ, that its response to the outbreak there has been a failure to protect the lives of i/m's and staff. Had SQ done nothing, the rates of infection there would have been roughly the same" [Citation.] Further, proffering how the diaster could have been avoided by releasing a substantial number of i/m's, as UCSF experts repeatedly recommended." (Id., Staich, supra, DJDAR at p. 11356.) Dr. Peter Chinhong, Dir. of UCSF Medical School's Infectious Diseases/Immunocompromised Host and Transplant Infectious Diseases Program agrees, that the population reduction recommended in the "URGENT MEMO" is necessary to effectuate distancing and separation in order minimal protection of the SQ native i/m population. (Id., Staich, Supra, DJDAR at p. 11356.)

A16. MCPHO, Dr. Willis, whom was initially told by Warden, Broomfield and other Medical Executives during the June 1st conference call that he had no jurisdiction to tell them anything, because this is a State prison, ultimately was made a member of the Response Team only after the COVID-19 outbreak at SQ was dubbed CDCR's worst screw-up ever. Still SQ refused to adhere to reducing the population, i.e., Dir. Allison and Sec. Diaz refused to follow the "URGENT MEMO's" directive regarding reducing the population nor the District Judge's directive to do the same. Thus, in excess of 2,200 confirmed cases of COVID-19 among SQ i/m's and 28 i/m deaths later, with one staff fatality as well. For all accounts experts deem the COVID-19 outbreak at SQ the worst epidemiological disaster in

13

California's history, constituting "deliberate indifference" under both State and Federal Constitution's, that is, Cruel and Unusual Punishment provisions of the Eighth Amendment to the United States Constitution, as well as Article 1, Section 17, of the California Constitution's Cruel and Unusual Punishment Clauses as well, compelling further disquisition.

A17. Plaintiff, asserts he has provided "a short and plain statement of the claim showing the pleader is entitled to relief" which "contains sufficient factual matter, accepted as true, to survive a motion to dismiss under Federal Rule of Civil procedure 12(b)(6) after the Supreme Court's decisions in Twombly and Iqbal prompting Discovery under Federal Rules of Civil Procedure, Rules 26-37.

A18. Public employees are liable for injuries resulting from their acts or omissions to the same extent as private persons.(Gov't Code section 820.) Public entities are correspondingly liable for the negligent acts or omissions of their employees acting under the color of State law authority. (See Gov't Code section 815.2).

A19. The plaintiff has no plain, adequate or complete remedy at law to redress the wrongs described herein.

## IX. PRAYER FOR RELIEF

A20. Wherefore, plaintiff respectfully prays that this Honorable Court enter judgment granting plaintiff:

A21. A declaration that the acts and omissions described herein vio-

14

lated plaintiff's rights under the Constitution and laws of the United States.

A22. A preliminary and/or permanent injunction ordering CDCR-SQ [whatever modification[s] this Honorable Court deems prudent] as well as attend to "all" of plaintiff's medical and dental concerns.

A23. Compensatory damages in the amount of $20,000.00, against each defendant, jointly and severally imposed.

A24. Punitive damages in the amount of $30,000.00, against each defendant, except Ron Davis, that amount is $50,000.00, jointly and severely imposed.

A25. A jury trial on all triable issues by a jury.

A26. Plaintiff's cost in this suit.

A27. Plaintiff requests the appointment of counsel pursuant to 28 U.S.C. section 1915(e)(1), i.e., he is mentally handicapped and, is presently incarcerated, and a trial will involve conflicting testimony and counsel would be in a better position to present evidence and cross-examine witnesses.

A28. Pursuant to Rule 34 of the Federal Rules of Civil Procedure Plaintiff requests Document Production, i.e., all written statements, reports, data, concerning COVID-19 CDCR has, original or copies,

15

made by CDCR Personnel, witnesses, or Public Officials, employees about the COVID-19 outbreak at San Quentin., and an unredacted IGR.

A29. Any additional relief this Honorable Court deems just, proper, and equitable.

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged herein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under the penalty of perjury that the following is true and correct.

Executed at San Quentin State Prison, on December 26, 2021.

Signature [signature]